IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL NO. 5:04CV066-V

BRENDA H. CARLYLE, )
    Plaintiff, )
)
vs. ) MEMORANDUM AND RECOMMENDATION
)
JO ANNE B. BARNHART, )
Commissioner of Social )
Security Administration, )
    Defendant. )
_____)

**THIS MATTER** is before the Court on the Plaintiff's "Motion for Summary Judgment" (document #7) and "Memorandum in Support ... " (document #8), both filed September 20, 2004; and the Defendant's "Motion For Summary Judgment" (document #9) and "Memorandum in Support of the Commissioner's Decision" (document #10), both filed November 9, 2004. This case has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

Having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Plaintiff's Motion for Summary Judgment be denied; that Defendant's Motion for Summary Judgment be granted; and that the Commissioner's decision be affirmed.

## I. PROCEDURAL HISTORY

On May 14, 2001, Plaintiff applied for a period of disability and Social Security disability insurance benefits ("DIB"), alleging she became disabled on October 15, 2000, as the result of fibromyalgia, emphysema, and chronic obstructive pulmonary disease ("COPD"). (Tr. 56, 71, 224.)

The Plaintiff's claim was denied initially and on reconsideration.

The Plaintiff requested a hearing, which was held September 10, 2003. On October 31, 2003, the ALJ issued an opinion denying the Plaintiff's claim.

Subsequently, the Plaintiff timely filed a Request for Review of Hearing Decision, which the Appeals Council denied on March 19, 2004, making the hearing decision the final decision of the Commissioner.

The Plaintiff filed this action on May 19, 2004, and the parties' cross-motions for summary judgment are now ripe for disposition.

## II. FACTUAL BACKGROUND

The Plaintiff testified that she was 55 years-old at the time of the hearing; that she had completed a Certified Nursing Assistant ("CNA") course; that she had stopped working in October 2000; that her last job was as a convenience store clerk, where she ran the cash register, stocked shelves, and cleaned the store; that she had also worked as a CNA, as a toe seamer in a hosiery factory, and on an assembly line at a furniture factory; that she could no longer work at the convenience store because of difficulty breathing; and that she smoked three packs of cigarettes each day.

Regarding her medical and emotional condition, Plaintiff testified that she suffered fibromyalgia, emphysema, and chronic obstructive pulmonary disease ("COPD"); that her doctor had told her to stop smoking; that she used an inhaler four times each day; that she had back, hip, and leg pain; that she had undergone an MRI the day before the hearing; that she took pain medication, which was effective for relieving some of her pain when she took it; and that she stopped taking one of her pain medications, Neurontin, because it caused diarrhea which was worse than her pain.

Regarding her daily activities, the Plaintiff testified that she made the bed, washed dishes, and did the household cooking; that she stayed home alone "most of the time"; that she walked in the yard; and that she drove to Wal-Mart and to the grocery store.

The record also contains a number of representations by Plaintiff as contained in her various applications in support of her claims. On a Disability Report, dated May 21, 2001, Plaintiff stated that her disabling condition was caused primarily by "fibromyalgia, emphysema, and COPD" (Tr. 71); and that she quit working in the furniture factory because she "couldn't stand being on [her] legs eight hours a day." Id. The Agency interviewer, who took the report telephonically, noted that the Plaintiff had no difficulty hearing, reading, breathing, understanding, concentrating, talking, answering, or forming coherent thoughts.

On January 30, 2002, an Agency medical expert completed a Physical Residual Functional Capacity Assessment and concluded that the Plaintiff could lift 50 pounds occasionally and 25 pounds frequently; that she could sit, stand or walk six hours in an eight-hour work day; that she had unlimited ability to push and/or pull; that Plaintiff should avoid concentrated exposure to fumes, odors, or dusts; but that the Plaintiff had no other restrictions. The expert further noted that the Plaintiff's medical records showed that she walked without assistance, maintained her balance well, could squat, had good range of motion and muscle strength, and had no trigger points; and that her lungs were clear; and opined that the Plaintiff had the residual functional capacity for medium work.

On March 14, 2002, an Agency medical expert completed a Physical Residual Functional Capacity Assessment and concluded that the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; that she could sit, stand or walk six hours in an eight-hour work day; that she had unlimited ability to push and/or pull; that Plaintiff should avoid concentrated exposure to fumes,

odors, or dusts; that the Plaintiff had no other restrictions; and that Plaintiff had the residual functional capacity for light work.

On an undated Work History Report, the Plaintiff stated that the heaviest weight she ever lifted at her convenience store clerk job was less than ten pounds.

On a Reconsideration Disability Report, dated April 16, 2002, Plaintiff stated that her condition was worse; but that her doctor had not placed any additional restrictions on her activities.

On an undated Claimant's Statement When Request for Hearing Is Filed, the Plaintiff stated that her condition was worse and that she was driving "less." (Tr. 114.)

On December 27, 2001, William Oliver Mann, D.O., completed a Psychiatric Review Technique and concluded that Plaintiff suffered depression, which was not a severe impairment; that the Plaintiff suffered mild, that is, nondisabling, restrictions of her activities of daily living and ability to maintain concentration; but there was no evidence of an extended episode of decompensation or of any difficulty in maintaining social function.

The parties have not assigned error to the ALJ's recitation of the medical records, although, as discussed below, the Plaintiff objects to the weight that he gave to some of the records of the Plaintiff's treating rheumatologist, John Winfield, M.D. Moreover, the undersigned has carefully reviewed the Plaintiff's medical records and finds that the ALJ's recitation is accurate. Accordingly, the undersigned adopts the ALJ's statement of the medical record, as follows:

> A physical exam on November 22, 1999, at Caldwell County Health Department demonstrated that the claimant experienced headaches, dizziness, mild nausea, and some respiratory symptoms, some treated by the over the counter medication such as Goody Powder and Pepcid (Exhibit 1F).
>
> On May 8, 2001, the claimant was referred to the emergency room at Caldwell Memorial Hospital, by Broyhill Clinic, for an evaluation of cough, congestion, and dehydration. Admitting physician, Gregory J. Taraska, M.D., observed the claimant

to be in no acute respiratory distress. A post anterior and lateral chest x-ray showed evidence of chronic lung disease, with no consolidating pneumonia or pneumothorax or pleural effusion. The heart size, pulmonary vasculature, other findings were normal. A medication regimen of Atrovent Inhaler, Albuterol nebulizer, and Prednisone were instituted for treatment of her conditions, including oxygen saturation. Dr. Taraska diagnosed the claimant with COPD with acute bronchitis (Exhibit 2F).

In a consultative physical examination conducted on January 24, 2002, Michael R. Lewis, M.D., recognized the claimant's problem with breathing difficulties, leg pain, and fibromyalgia. He also noted that the claimant reported complaints of an inability to perform any work, household, or exertional activities without wheezing, chest pain, and severe dyspnea despite a longstanding history (since the age of 13 years old) of 1-1/2 to 3 packs a day tobacco (cigarette smoking) abuse. The claimant reported bilateral lower extremity pain, coldness, and numbness preventing her from performing any activity or walking, and in which are reduced when elevated. She also stated that she had been diagnosed with fibromyalgia in which achy muscles in her neck, and shoulders, thighs, upper legs, and arms, bilaterally, rendering mobility discomforts and overhead reaching. In a system review of the claimant, Dr. Lewis reported that the claimant experienced infrequent feelings of lightheadedness and dizziness and had never passed out or lost consciousness and that she received pretty good results using Pepcid AC daily for a history of hiatal hernia, with no evidence of gastric upset (GU). Dr. Lewis observed the claimant to be alert and pleasant with no evidence of distress. Other than mild discomfort on range of motion of her neck, her examination resulted in normalcy and unremarkable results. Under a neuromuscular exam, Dr. Lewis observed the claimant to walk without any difficulty; get in and out of chair and on and off the table without assistance; maintained her balance well; able to grasp a penny of the flat surface with either hand; sustained good range of motion of all joints with expressions of discomfort in the shoulder but the range of motion of all joints were intact; strength of legs, bilaterally, were intact; reflexes were symmetric; Babinski's were negative and grip strength were intact; and she sustained general muscular tenderness with no specific tender points. The claimant reported that she was unable to squat but was observed to squat down and get back up. Dr. Lewis regarded the claimant as having COPD secondary to smoking extent unknown without pulmonary function studies, a history of fibromyalgia, and hypothyroidism (Exhibit 4F).

On January 24, 2002, a pulmonary function assessment performed ... at Blowing Rock Hospital, documented the claimant to have moderate and severe pulmonary obstruction, consistent with heavy tobacco usage, with no evidence of shortness of breath at rest or on exertion, no evidence of fatigue, wheezing, and coughing. (Exhibit 5F).

Ophthalmology exam performed on March 28, 2000, and April 28, 2002, found the

claimant to have dry eye with erosions and mild blepharitis, corrective with glasses and sample eye drops prescribed by John Tye, M.D. (Exhibit 6F).

Under sporadic medical care of John Maggiore, M.D., and Rebekah Robinson, M.D., at Broyhill Family Clinic during the period from October 6, 1998, through April 24, 2002, the claimant reported complaints of chest pains, blurry visions, chronic headaches, low back pain, and shortness of breath. A physical exam on April 5, 2001, was assessed to be normal. In a follow-up exam on May 24, 2001, Dr. Maggiore found the claimant to have reactive airway disease due to smoking, stating that the claimant was doing reasonably well with significantly clearer lungs and mild wheezes. An EKG in December, 2001, was fairly normal and a nuclear stress test on January 4, 2002, resulted in normal perfusion study with no inducible ischemia and normal left ventricle function. Dr. Robinson noted the claimant appeared to substantially improve medically-wise in January and April, 2002. She had observed the claimant to be in no acute distress with lungs bilaterally cleared to auscultation, that her heart was normal with no evidence of palpitations or chest pain, and that she had 7/18 trigger points with no evidence of swelling, joint stiffness or coldness of the extremities (Exhibits 7F).

The claimant was presented to John Winfield, M.D., occasionally on January 17, 2003, May 27, 2003, and August 29, 2003, for complaints and symptoms of fibromyalgia. Initially in January, 2003, Dr. Winfield noted the claimant only had taken Elavil for fibromyalgia and that musculoskelatally she sustained full range of motion of all joints, multiple painful tender points, and normal motor strength. He recommended aqua therapy and increased Neurontin from 300 mg to 600 mg. The claimant denied cigarettes or alcohol. Follow-up in May, 2003, showed the claimant to be tired in no acute distress. She reported that physical and aqua therapy especially in the hot tub helped her pain tremendously. Dr. Winfield recommended Capasaicin cream, Oxycodone, or Duragesic patch to obtain [sic] significant pain (Exhibits 10F, 12F, 13F).

(Tr. 14-16.)

The ALJ considered all of the above-recited evidence and determined that Plaintiff was not "disabled" for Social Security purposes. It is from this determination that Plaintiff appeals.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1383(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the

Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). The district court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

As the Social Security Act provides, "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), quoting Richardson v. Perales, 402 U.S. 389, 401 (1971), the Fourth Circuit defined "substantial evidence" thus:

> Substantial evidence has been defined as being "more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

See also Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence").

The Fourth Circuit has long emphasized that it is not for a reviewing court to re-weigh the evidence, nor to substitute its judgment for that of the Commissioner, assuming the Commissioner's final decision is supported by substantial evidence. Hays v. Sullivan, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d at 345; and Blalock v. Richardson, 483 F.2d at 775. Indeed, this is true even if the reviewing court disagrees with the outcome – so long as there is "substantial evidence" in the record to support the final decision below. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

7

## IV. <u>DISCUSSION OF CLAIM</u>

The question before the ALJ was therefore whether the Plaintiff became "disabled" as that term of art is defined for Social Security purposes.[1]

The ALJ considered the above-recited evidence and found after the hearing that Plaintiff had not engaged in substantial gainful activity at any time relevant to this proceeding; that the Plaintiff suffered "COPD, fibromyalgia, and a tobacco abuse disorder," which were severe impairments within the meaning of the Regulations; but that Plaintiff's impairment or combination of impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (a.k.a. "the Listings"); that Plaintiff had the residual functional capacity for light work; that the Plaintiff's "COPD exacerbated by heavy tobacco abuse and fibromyalgia bares [sic] minimal limitation for the claimant to function socially and occupationally"; that the Plaintiff was able to perform her past relevant work, including as a convenience store cashier/clerk; and that, accordingly, the Plaintiff was not disabled.

The Plaintiff essentially appeals the ALJ's determination of her residual functional capacity ("RFC"). See Plaintiff's "Motion for Summary Judgment" (document #7) and "Memorandum in Support ... " (document #8). The undersigned finds that Plaintiff's assertion of error is without merit, however, and that substantial evidence supports the ALJ's conclusions regarding the

---

[1] Under the Social Security Act, 42 U.S.C. §301, et seq., the term "disability" is defined as an:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

Pass v. Chater, 65 F. 3d 1200, 1203 (4th Cir. 1995).

8

Plaintiff's residual functional capacity.

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b).

The ALJ's opinion clearly indicates that he did, in fact, consider whether Plaintiff's alleged impairments limited her ability to work. Agency medical evaluators concluded that the Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; that she could sit, stand or walk six hours in an eight-hour work day; that she had unlimited ability to push and/or pull; that Plaintiff should avoid concentrated exposure to fumes, odors, or dusts; that the Plaintiff had no other restrictions; and that Plaintiff had the residual functional capacity for light work. Agency psychological evaluators found that the Plaintiff's alleged depression was not a severe impairment and placed, at most, a mild restriction on her activities of daily living and ability to maintain concentration.

However, the ALJ found the Plaintiff not disabled based on her ability to perform her past relevant work, including her convenience store cashier/clerk job, which as the Plaintiff described it in her Work Activity Report, was a sedentary job that did not involve exposure to any fumes, dust or other respiratory irritants.[2]

At the outset, the undersigned notes that no physician has ever opined that the Plaintiff was

---

[2] The Dictionary of Occupational Titles ("DOT") indicates that as it is generally performed in the national economy, the Plaintiff's cashier/clerk job was a "light" job, that is, within the Plaintiff's RFC. (Tr. 106-107).

disabled from working, nor does the medical record show that a doctor ever placed permanent restrictions on the Plaintiff's activities. To the contrary, no doctor who examined the Plaintiff ever concluded that her condition was as severe as she claimed, and Dr. Lewis, who evaluated the Plaintiff consultatively, opined that she _could_ work.

The Plaintiff contends that the ALJ did not fully explain his rationale for the weight he gave to two of Dr. Winfield's treatment notes, that is, office visits on August 29 and November 7, 2003, both occasions when the Plaintiff exhibited numerous fibromyalgia trigger points and was prescribed Oxycodone for pain. The Fourth Circuit has established that a treating physician's opinion need not be afforded controlling weight. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). A treating physician's opinion on the nature and severity of the alleged impairment is entitled to controlling weight only if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2) (2002); and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Therefore, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Mastro, 270 F.3d. at 178, citing Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

Dr. Winfield first examined Plaintiff in January 2003, and the chart reflects that Plaintiff reported having been diagnosed with fibromyalgia in 1991; that she claimed her condition caused diffuse pain that she rated as "6" on a scale of 1 to 10; that the only medication she was taking for her fibromyalgia was 50 mg of Elavil taken at bedtime; that Plaintiff was in no acute distress at the time of the examination; that her chest was clear to auscultation and percussion; that her motor strength was normal; that she had full range of motion in all joints and her reflexes were

symmetrical; but that she reported multiple painful fibromyalgia tender points. Dr. Winfield diagnosed fibromyalgia, urged Plaintiff to begin aqua therapy, and prescribed Neurontin, a pain medication.

At her next visit to Dr. Winfield in May 2003, Plaintiff reported that physical therapy and aqua therapy "helped a lot," but that her pain had increased to an "8."

In August 2003, Plaintiff reported pain and fatigue at a "10" level, multiple trigger points, and increased pain in her left lower back and left leg over the past several months. Dr. Winfield diagnosed fibromyalgia and probable left lateral radiculopathy secondary to degenerative disc disease, noted that Plaintiff had ceased taking Neurontin because the side effect of diarrhea was worse than her pain, and prescribed Oxycodone.

The Plaintiff also saw Dr. Winfield in November 2003, after the administrative hearing, but the report of that visit, which was received by the Appeals Council and considered in its decision not to remand to the ALJ, does not offer any new evidence supporting a finding that the Plaintiff was disabled. Rather, the November 2003 report detracts from Dr. Winfield's earlier findings because an MRI showed "only mild disc bulges," did not reveal objective signs of radiculopathy, and, accordingly, contradicted Dr. Winfield's August 2003 opinion that the Plaintiff probably suffered radiculopathy. Moreover, Dr. Winfield noted that the Plaintiff "was getting along quite well with respect to her pain on Oxycodone" he had prescribed in August, but that she "has been out of this for some time," that is, despite the relief it provided, Plaintiff did not ask for a refill of her prescription prior to her regular three-month appointment. On this point, see Mickles v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994) (evidence of treatment and medical regimen followed by claimant is proper basis for finding of no disability) (Hall, J., concurring for divided panel); and Gross v.

Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling"), citing Purdham v. Celebrezze, 349 F.2d 828, 830 (4th Cir. 1965).

Rather than proving the existence of a disability, Dr. Winfield's relatively normal examination results are similar to those of Dr. Lewis who had examined Plaintiff in January 2002 and Dr. Maggiore's examination of Plaintiff in April 2002. Indeed, the medical record clearly supports the ALJ's essential conclusion that the Plaintiff suffered from, but was not disabled by, COPD, fibromyalgia, and a tobacco abuse disorder. Although a January 24, 2002 pulmonary function assessment documented moderate to severe pulmonary obstruction consistent with heavy tobacco usage, there was no evidence that the Plaintiff suffered shortness of breath at rest or on exertion, fatigue, wheezing, or coughing.

Under sporadic medical care of Dr. Maggiore and Dr. Robinson at Broyhill Family Clinic during the period from October 6, 1998, through April 24, 2002, the claimant reported complaints of chest pains, blurry visions, chronic headaches, low back pain, and shortness of breath. However, a physical exam on April 5, 2001, was normal. In a follow-up exam on May 24, 2001, Dr. Maggiore found the claimant to have reactive airway disease due to smoking, stating that the claimant was doing reasonably well with significantly clearer lungs and mild wheezes. An EKG in December, 2001, was fairly normal and a nuclear stress test on January 4, 2002, resulted in normal perfusion study with no inducible ischemia and normal left ventricle function. In April 2002, Dr. Robinson noted the claimant appeared to substantially improved, that is, Plaintiff was in no acute distress with lungs bilaterally cleared to auscultation, her heart was normal with no evidence of palpitations or chest pain, and although she had 7 of 18 trigger points, there was no evidence of swelling, joint

stiffness or coldness of the extremities.

The record also establishes that the Plaintiff engaged in significant daily life activities during the subject period, such as making the bed, washing dishes, and doing all of the household cooking; that she stayed home alone "most of the time"; that she walked in the yard; that she drove to Wal-Mart and to the grocery store; and that Plaintiff was also able to perform basic cognitive and physical tasks. On the relevance of an ability to engage in substantial daily activities to a disability claim, see, e.g., Mickles, 29 F.3d at 921 (plaintiff performed "wide range of house work" which supported finding of non-disability); and Gross, 785 F.2d at 1166 (evidence that plaintiff washed dishes and generally performed household chores supported finding of non-disability).

The ALJ also properly applied the standard for determining a claimant's residual functioning capacity based on subjective complaints of pain and, in this case, the record contains substantial evidence to support the ALJ's conclusion that Plaintiff's testimony was not fully credible.

The determination of whether a person is disabled by non-exertional pain or other symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), citing 20 C.F.R. § 416.929(b); and § 404.1529(b); 42 U.S.C. § 423(d)(5)(A). If there is such evidence, then the ALJ must evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Id. at 595, citing 20 C.F.R. § 416.929(c)(1); and § 404.1529(c)(1). The regulations provide that this evaluation must take into account:

> not only the claimant's statements about his or her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory

13

findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Craig, 76 F.3d at 595 (citations omitted).

The record contains evidence of Plaintiff's COPD, fibromyalgia, and a tobacco abuse disorder – which <u>could</u> be expected to produce some of the pain claimed by Plaintiff – and thus the ALJ essentially found that Plaintiff could satisfy the first prong of the test articulated in Craig. However, the ALJ also correctly evaluated the "intensity and persistence of [her] pain, and the extent to which it affects [her] ability to work," and found Plaintiff's subjective description of her limitations not credible.

"The only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life." Mickles, 29 F.3d at 921, citing Hunter, 993 F.2d at 31 (claimant's failure to fill prescription for painkiller, which itself was indicated for only mild pain, and failure to follow medical and physical therapy regimen, supported ALJ's inference that claimant's pain was not as severe as he asserted). In this case, the record before the ALJ clearly established an inconsistency between Plaintiff's claims of inability to work and her objective ability to carry on with moderate daily activities, that is, Plaintiff's ability to take care of her personal needs, do household chores, to drive, and to go to Wal-Mart and the grocery store, as well as the objective medical record, discussed above.

Although the medical records establish that the Plaintiff experienced pain and mental and emotional difficulties to some extent or degree, as the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist v.

14

Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Moreover, the facts noted by the ALJ clearly support the ultimate conclusion that Plaintiff suffered from, but was not disabled from working, by her combination of impairments.

Simply put, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary (or the Secretary's designate, the ALJ)." Mickles, 29 F.3d at 923, citing Simmons v. Bowen, 834 F.2d 635, 640 (7th Cir. 1987). This is precisely such a case, as it contains substantial evidence to support the ALJ's determinations of the Plaintiff's residual functional capacity.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS,** the undersigned respectfully recommends that Plaintiff's "Motion For Summary Judgment" (document #7) be **DENIED;** that Defendant's "Motion for Summary Judgment" (document #9) be **GRANTED**; and that the Commissioner's determination be **AFFIRMED.**

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this Memorandum must be filed within ten (10) days after service of same. Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F. Supp. 101, 102 (W.D.N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d

841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties; and to the Honorable Richard L. Voorhees.

**SO RECOMMENDED AND ORDERED,** this 17th day of November, 2004.

*Carl Horn, III*
CARL HORN, III
U.S. Magistrate Judge

cbb

United States District Court
for the
Western District of North Carolina
November 18, 2004

* * MAILING CERTIFICATE OF CLERK * *

Re: 5:04-cv-00066

True and correct copies of the attached were mailed by the clerk to the following:

    Fred D. Pike, Esq.
    P.O. Box 776
    Lenoir, NC 28645

    Donald H. Caldwell Jr., Esq.
    U.S. Attorney's Office
    227 W. Trade St.
    1700 Carillon Bldg.
    Charlotte, NC 28202

cc:
Judge VOORHEES (✓)
Magistrate Judge ( )
U.S. Marshal ( )
Probation ( )
U.S. Attorney ( )
Atty. for Deft. ( )
Defendant ( )
Warden ( )
Bureau of Prisons ( )
Court Reporter ( )
Courtroom Deputy ( )
Orig-Security ( )
Bankruptcy Clerk's Ofc. ( )
Other_____ ( )

Date: 11-18-04

Frank G. Johns, Clerk
By: Carolyn B. Bouchard
    Deputy Clerk